IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Criminal No. 1:14-cr-00058-BAH** |
| **v.** | : | |
| | : | |
| **DOMINGO AVILEZ URIAS,** | : | |
| Defendant. | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

## I.   OVERVIEW AND RECOMMENDED SENTENCE

Defendant Domingo Avilez Urias is scheduled to be sentenced on March 4, 2016.  Mr. Avilez pleaded guilty on October 23, 2015 to Count One of a two-count Indictment charging him with conspiracy to distribute five kilograms or more of cocaine, five hundred grams or more of methamphetamine and one thousand kilograms or more of marijuana for importation into the United States, in violation of 21 U.S.C. §§959(a), 960, and 963.  Mr. Avilez has no prior criminal record.

Domingo Avilez was arrested on these charges on August 13, 2014 while seeking to enter the country on a tourist visa at the border crossing in El Paso, Texas.  On September 3, 2014, he was transferred to the United States District Court for the District of Columbia where pursuant to Rule 5(c)(3) he was ordered held without bond.

Domingo Avilez was born in a rural area of Sinaloa state in central Mexico.  However, he was raised since the age of twelve in the border city of Tijuana, Baja California.  Domingo has only an 8th grade education.  He married at the age of eighteen, though his wife has recently separated from him while he has been in custody on the pending charges.  He has an 8 year old son with whom he was very closely bonded until his arrest.  Domingo does not have any family residing in the United States; hence, with a single exception early on, no family member has been

1

able to come visit him during the entire time that he has been in custody.

Domingo Avilez's young age, combined with his lack of sophistication and guidance, left him vulnerable to being recruited to participate in this drug offense.  There is reason to believe that Domingo would not have landed in these circumstances but for a confluence of fortuitous circumstances.  When asked to assist extended family members with drug-related errands, he made the horrible mistake of acceding to their request.  However, he understands there can be no excuses or rationalizations, and he accepts full responsibility for his illegal conduct.

Numerous letters are appended from the members of Domingo's family, as well as from neighbors, parents of his son's schoolmates, and other individuals who know him.  These letters discuss his work ethic; his sense of duty to his mother, sisters and brother, nephews and nieces, wife and son; and, particularly, his deep regret at committing the crime that brings him before this Court.  His arrest, prosecution, and detention have all been an eye-opener for this young man.  He has consistently expressed his contrition since a very early stage of these proceedings.

Once his sentence is completed, Domingo will be deported to Mexico and barred from ever reentering or visiting the United States.  It augurs well for him that his family makes up a capable and loving support network that is pledged to help him readjust upon his return.

Defendant Domingo Avilez, through counsel, submits that the combination of mitigating circumstances present in this case, which include his youth, lack of a prior record, the unusual family circumstances that led him to become enmeshed in the offense conduct, and his very early, forthright acceptance of responsibility, all warrant a sentence well below the 17 years (204 months) that represents the low end of the advisory guidelines as recommended by the United States Probation Office, minus the 6-month *Smith* departure which the USPO also recommends.

18 U.S.C. §3553(a) addresses the need for the punishment imposed to be "sufficient, but

not greater than necessary" to achieve the enumerated purposes of sentencing. It is respectfully submitted that the totality of mitigating circumstances, along with the humanitarian needs of Mr. Avilez's family and young son, support a sentence of not more than the statutory minimum of ten years incarceration.

## II.   COMMENTS REGARDING THE ADVISORY GUIDELINES

Defendant Avilez concurs with the Offense Conduct summary set forth in the Presentence Report (hereinafter "PSR") at Pages 5-6 (¶¶15-20) as well as the Stipulated Facts Statement appended to the Plea Agreement.

The USPO has calculated advisory guidelines consistent with the Plea Agreement, as summarized below:

<u>Advisory Guidelines</u>

| | | |
|---|---|---|
| 1. | Base Offense Level [U.S.S.G §2D1.1(c)(1)] | 38 |
| 2. | Possession of a Firearm in Connection with the Offense [U.S.S.G.§2D1.1(b)(1)] | +2 |
| 3. | Acceptance of Responsibility [U.S.S.G. §3E1.1(a)] | -3 |
| | Total Offense Level | 37 |
| | Criminal History Category | I |
| | Advisory Guideline Range | 210-262 months |
| | Statutory Minimum Term | 120 months |
| | Sentence Recommended by the USPO | 204 months |

On the issue of Role in the Offense, the Probation Officer observes:

Defendant Domingo Avilez Urias was a member of a drug

trafficking organization.  As part of his involvement, he acted as a

narcotics broker for cocaine and marijuana shipments that

ultimately were illegally imported into the United States.  Based on

the information provided to date, an aggravating or mitigating role

adjustment, pursuant to U.S.S.G. §§3B1.1 or 3B1.2 does not

appear to apply to this defendant for his conduct in the criminal

conspiracy.  (See Presentence Report, Page 7, ¶24.)

The Probation Office recommends the *Smith* departure, pointing out that "the DC Circuit

has ruled a downward departure may be appropriate if the defendant's status as a deportable alien

is likely to cause fortuitous increase in the severity of confinement.  United States v. Smith, 27

F.3d 649 (307 U.S. App. DC 1994)."  (See Presentence Report, Page 17, ¶ 99.)  Defendant agrees

that such a reduction is applicable and appropriate.

The defendant, through undersigned counsel, concurs with the guideline calculations

described above.  However, it is well-settled that a sentencing judge now has full authority to

impose sentences based on the totality of §3553(a) factors, and that under the advisory guideline

sentencing system created by United States v. Booker, 543 U.S. 220 (2005), a sentence within the

guideline range is not *per se* reasonable.  Mr. Avilez accepts full responsibility for his conduct,

but asks this Court to be leery of the guideline drug table as the ultimate caliper of culpability.

The Supreme Court in Gall v. United States, 552 U.S. 38 (2007), specifically found that the

guidelines themselves are often not tied to empirical evidence, particularly in drug offenses.  *Id.*

552 U.S. 38, n. 2 (2007).  In United States v. Cabrera, 567 F.Supp.2d 271 (D. Mass 2008), the

defendant was convicted of possession of drugs with intent to distribute and had guidelines of

70-78 months.  The court imposed a sentence of 24 months and observed that "the Sentencing

Commission has never explained how drug quantity is meant to measure offense seriousness, and significantly, how it correlates with the purposes of sentencing under 18 U.S.C. §3553(a).  The only explanation, which one has to infer from the guidelines, is that drug quantity is somehow a proxy for culpability.  The problem is that sometimes it is an adequate proxy, and sometimes it is not."  Id.  See also Peter Reuter & Jonathan P. Caulkins, Redefining the Goals of National Drug Policy: Recommendations from a Working Group, 85 Am J. Pub. Health 1059, 1062 (1995) (reporting recommendation of RAND Corporation working group which concluded that "federal sentences for drug offenders are often too severe: they offend justice, serve poorly as drug control measures, and are very expensive to carry out...")

III.    **THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT SUPPORT THE REQUESTED SENTENCE OF 120 MONTHS**

This Court is asked to weigh and consider the difficult circumstances of Domingo Avilez's youth and his high level of dedication to his mother, son, and other family members.  In Gall v. United States, 552 U.S. 38 [128 S. Ct. 586, 169 L.Ed. 2d. 445[ (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3533(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented."  Gall at 596-597.

In  Pepper v. United States, 562 U.S. __, 131 S. Ct. 1229, 1239-1240 (2011), quoting Koon v. United States, 518 U.S. 81, 113 (1996), the Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.' "  Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949).  The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the

selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

 In keeping with the above, the following social history information is presented.

A.    _Family Background_

The defendant, Domingo Avilez Urias, was born on December 27, 1983 in Navolato, Sinaloa, Mexico.  His father, Domingo Avilez Moreno (hereinafter "Domingo, Sr."), was the owner and operator of a business which sold clothing and secondhand merchandise in Mexico. He also ran a used car lot.

On August 26, 2008, Domingo, Sr. was murdered when an unknown person telephoned him and, utilizing a ruse, requested that he step outside of the family home.  Once outside, Domingo, Sr. was ambushed and shot multiple times.  The defendant, Domingo, Jr., was the first person to discover his father's body.  Domingo, Sr. was 49 when he died.  Though there have been rumors and conjecture, to this day family members have heard no reliable account of why their father was killed.

Domingo's mother, Maria Isabel Urias Aceves, is now 57 years old.  She lives in Tijuana, Mexico with one of her adult daughters, Brenda Avilez.  Domingo and his twin brother, Jesus Avilez, are the youngest of seven children and the only males.  Despite coming from a mostly agrarian background in which neither parent had more than a grade school education, all five sisters went to college and built successful careers, four of them as educators.  All six of the siblings are married, have children, and reside in the city of Tijuana.

Domingo's oldest sister, Melecia, 38, has been a high school teacher for ten years.  His next sister, Brenda, 37, teaches high school as well.  Together with her husband, Brenda operates a side business that offers courses, seminars and workshops for corporations, entrepreneurs,

government agencies, and to the general public in the Psychology of Human Personal

Development Skills throughout Mexico.  Both Brenda and Melecia graduated with honors from

the Autonomous University of Baja California.  Both have received numerous recognitions and

awards for their contributions to teaching.

Domingo's next sister, Heide, 36, studied law with a subspecialty in tourism at the

Autonomous University of Baja California and now teaches high school.  Telma Yuridia, 35,

works part-time as an accountant and also teaches part-time at public high schools in Tijuana.

Telma earned her degree in accounting at the Autonomous University of Baja California.  The

youngest, sister, Bianca, 32, works in marketing and promotion for department stores.

Domingo's twin brother, Jesus, buys and sells used cars.

B.      _Personal Upbringing and Education_

Domingo and his family originally lived in the isolated rural community of Huixiopa,

Sinaloa, Mexico, and then moved a couple of hours away when Domingo was six to Culiacan,

the nearest large city and state capital where he lived during his early school years.  When

Domingo was about to start middle school, he and his family moved again to the border city of

Tijuana, which even then was known for its poverty, vice, lawlessness and violence.  A number

of years after they arrived, Domingo's sister Bianca, who is only a year older, was kidnaped and

held for ransom.  Fortunately, she was eventually released without suffering physical injury.

Domingo attended middle school in Tijuana where he competed in athletics such as

soccer and other normal teenage past-times.  When he was about 15 years old, his mother, twin

brother, and several sisters all moved to North Carolina where he briefly enrolled in high school.

Domingo reports that he enjoyed his exposure to the United States on this trip -- the first and

only occasion that he spent any appreciable time in this country -- and he was fascinated by the

different sports, hobbies, and fashions popular among his new peer group.  He found his teachers friendly and welcoming, though his academic achievement was limited due to his complete lack of English.  After a few months, Domingo left school to work alongside his mother and his sisters in a seasonal job making pinecone wreaths where he was paid piece-rate and could sometimes earn up to $300 in a week.  After a few months, the job ended and Domingo, together with his mother and family, returned to Mexico.

C.      _Marriage/Parental History_

In 2002, Domingo began living  Gloria Beltran Gonzalez.  He was 18 years old at the time and she was 21.  Domingo had been visiting his hometown in Sinaloa when he met Gloria at a children's birthday party.  They communicated by long distance for several months, until Gloria left her aunt's home in Sinaloa and came to live with Domingo in Tijuana.

Originally, Gloria and Domingo resided with his parents in Tijuana.  In 2003, they received a tip that Gloria was at imminent risk of being kidnaped if she remained in the city due to old rivalries involving her family.  Gloria and Domingo immediately fled Tijuana for Culiacan, where they lived during the next two years.

In 2005, Domingo and Gloria returned to Tijuana.  In 2007, their son, Marcos Jesus Avilez Beltran, was born.  Domingo's sister Bianca Avilez recalls in her appended letter:

> He was in a committed relationship while he was still young with
>
> his current wife (with whom he eventually got married).  There
>
> were many years where she struggled to become pregnant and they
>
> began fertility treatments and after many attempts their long
>
> awaited son was born.  Today Marcos Jesus is eight years old and
>
> he was named after Jesus Christ due to the miracle of his

conception.  I was his godmother for his baptism.  There has

always been strong rapport between my brother and I, and when

they had their child, I was the first one he told.  I could say that

fatherhood truly has been one of his greatest pleasures.

The couple's son is now living with Gloria in Tijuana.  However, within about six

months of his arrest, Gloria grew distant and eventually terminated her relationship with

Domingo.  Bianca Avilez further describes in her letter:

This situation has turned out to be very difficult for my brother due

to his wife abandoning him shortly after his incarceration while at

the same time preventing him from communicating with his son.

Marcos is a fundamental part of Mingo's life; he is a young, self-

assured and extroverted individual. However, with his father's

absence his development hasn't been the same. He is starting to

receive psychological treatment where it has been noted that he is

depressed and inattentive, and affected by being unable to

communicate with his father....

Our mother is currently experiencing heart problems which are

causing her to get regular checkups. This is also a serious concern

for my brother who is worried that something will happen to her

and he won't be able to be by her side. This is among his greatest

fears.

Domingo continues to have intermittent communication, as permitted, with their son

Marcos, though it has become much more problematic due to his separation from Gloria and the

panoply of emotions and resentments that typically accompany such a break-up.  In the

Presentence Report, the Probation Officer notes:

> ...approximately three months ago [prior to the interview by the
>
> Probation Officer, which occurred in November of 2015] he
>
> [Marcos Avilez] began receiving weekly therapy from a school
>
> psychologist because he appeared depressed and his grades were
>
> falling.  With the same technology he uses to communicate with
>
> his family, the defendant is able to teleconference with his son's
>
> therapist.  The defendant believes his legal situation has
>
> contributed to his son's recent issues.  The defendant
>
> acknowledged he has been truthful with his son and advised him
>
> that it will be several years before the defendant will return home.
>
> He believes his absence from his son's daily activities has had a
>
> negative effect on his son's well being.  The defendant, who
>
> considers himself a great father, is remorseful for what he has
>
> done.  (See Presentence Report, Page 10, ¶ 46.)

In her appended letter to the Court, the mother of a classmate of Marcos Avilez writes:

> About three years ago my son began attending a Catholic
>
> elementary school and we had the pleasure of meeting Domingo
>
> and Gloria who are the parents of Marcos.  Marcos is my son's
>
> schoolmate with whom he became very good friends.  Domingo
>
> was always attendant to Marcos' needs.  He was also always
>
> willing to help or support him in any way possible to further the

education of his son.  He has always spent quality time with

Marcos with whom he reflected on how his day went.

Marco has changed significantly since his father's arrest because

he is always distracted, sad and very serious.  I think that Marcos

will return to being his old self if he has his other paternal figure at

home.  This will motivate him to get ahead.  Gloria has done her

best job to help him get ahead and to always have a smile around

her son.  I do not want to imagine the pain that Domingo's mistake

has caused his beautiful family.

D.    *Employment*

When Domingo was a teenager in Tijuana he found seasonal part-time employment as a

campaign worker for one of the local political parties, putting up election posters and taking

voter surveys.

At the age of 16, Domingo began running errands for his father's used car lot and second-

hand clothing business in Tijuana.  Even before these endeavors, he had shown an

entrepreneurial streak.

His sister, Telma Yuridia Avilez Urias, recounts in her letter to the Court:

..he began to work as a child as a small business owner by selling

ice cream and muffins.  He came into this type of work because my

parents had a small business in the market where they sold milk

and bean products.

...Domingo interrupted his studies because he got married at a very

young age and he needed to start working to support his family.

From that moment on he wholeheartedly dedicated himself to being a businessman.  He began by buying and selling used cars, but due to his financial situation he began looking for other types of work because selling used cars was no longer sufficient to support his wife and son.  He saw an opportunity in purchasing taxis and then acquiring the license plates so they could be put into use by being rented to provide transportation services to the entire city.

It is worth noting that his taxi rental business is what is helping to support his son.  In addition to renting out taxi license plates he was also planning on starting a business selling and repairing refrigerators...

From 2004 to the date of his arrest, Domingo bought, refurbished, and resold used cars. Starting in 2009, he also operated a business that installed and repaired commercial air conditioning units.  This company was based in Tijuana and he employed one other person. Beginning in 2013, Domingo acquired two taxi cabs which he rented out by the shift to cab drivers.  Other than the taxis which continue to be rented out, the businesses ceased operating following Domingo's arrest.

E.    *Community Involvement*

For several years, Domingo regularly volunteered with his son's soccer team in Tijuana. He helped coach the boys and organized car washes and similar events to raise funds for equipment and uniforms.  Domingo has also been actively involved in Marcos' school and extracurricular activities.

One of the parents from his son's school, Mr. Esquer, writes:

> Through this letter I would like to make known that I have known
> Domingo Avilez ever since 2013 since both our children are in the
> same school and soccer team.
>
> He was always close to his family and especially to his son whom
> he helped at all moments.  We know the difficult situation that his
> family is going through but above all his son.  His son misses him
> a lot and he has been greatly affected by this in all aspects of his
> life.  They used to always be seen together very happily.  I hope
> that he can soon return to his family and that he appreciates every
> moment of his son's childhood because his son truly needs him.

Beginning in 2011, Mr. Avilez supported an orphanage in Tijuana.  Cristian Navarro Real
attests:

> Through this letter I would like to send you a formal greeting to
> inform you of the unconditional support that Domingo Urias
> Avilez has given us for our worthy cause in favor of helpless
> children in orphanages in the city of Tijuana, B.C.
>
> This event only occurs in the month of December at the Municipal
> Auditorium in the same city in which a total of 300 orphanages
> receive voluntary donations from our charity organization.
>
> For the past three years Domingo Avilez Urias has supported us
> with donations of food, gifts, and transportation for the children's
> home, "Nueva Esperanza," which is responsible for caring for 50

> homeless children and thanks to his support the children have
>
> benefitted psychologically, emotionally and spiritually.  We are
>
> infinitely grateful for everything we have received in support of
>
> such a humanitarian cause...

## IV.      FAMILY AND COMMUNITY SUPPORT

More than a dozen people have submitted character letters attesting to Domingo Avilez's positive attributes, his closeness to his family and, particularly, to his remorse.  These letters, together with their accompanying translations into English, are appended.  A few are excerpted below.

Heide Avilez, the defendant's sister, writes:

> Domingo has always had a kind heart and he is always moved by
>
> seeing homeless children or elderly people on the street.  He takes
>
> action by helping others without asking anything in return, he has
>
> even engaged in charitable work by helping orphanages.
>
> Ever since he was a child he has liked to work.  I even recall that
>
> one of his first jobs was as a seller of popsicles because at that time
>
> we all lived together as a family.  He has always been known for
>
> kindness whenever someone did not have enough to buy a popsicle
>
> he would give it away even though my mother would get angry.
>
> I only ask for a little consideration on behalf of my brother.
>
> Among other things he is a man who knows how to recognize that
>
> he was wrong and he always tries to make amends for his mistakes.

Maricruz Valdez, a fellow school parent, states:

I think that the time he has spent away from his family especially his son Marcos has served him well to reflect on the offense he committed.  Believe me it has hurt all three family members especially Marcos because to him his father is the most important thing.

Brenda Cristina Avilez, sister, adds:

As a parent he is an excellent role-model for his son.  He is a caring, understanding, responsible and loving father.  He is always concerned about his son's needs.  That is why it has been a very difficult situation in which he finds himself at this moment.  This is a difficult period in his life because he knows his son needs him and there is nothing he can do to help him. Not only is Domingo affected by this experience but also my nephew Marcos Jesus Avilez.  My nephew has had to receive psychotherapy due to my brother's absence. In not having constant interaction with his father my nephew has become withdrawn, sad and with much need of being reunited with my brother....

I definitely think that Domingo is getting a good lesson in undergoing this experience which he perhaps never imagined.  I think he realizes that there is nothing like being free and spending time with family.  I am certain that he has learned a lot of things because of where he is right now.  He will learn to appreciate his freedom and he will know how to make the right types of friends.

And Bianca Avilez, the sister closest in age to Domingo, observes:

> I have noted that during this time my brother has been in prison he
> has matured a lot. He is much more aware of the values that are
> important in life and he is willing to become a better person.
> My brother has commented that being inside the prison has made
> him want to pursue his education again and specialize in the study
> of law so that he can help people overcome difficult situations,
> such as the one he is undergoing....

Bianca concludes:

> One thing I can share is that my brother is a person who has a good
> heart and as a human has a lot to offer to society. He has a high
> potential to succeed and be a good person. This situation has
> caused him to value the things that matter most in life.
> I ask in the most attentive manner that you have consideration for
> my brother at the time of sentencing. I believe he has learned his
> lesson and we are all anxiously waiting for him so that he can start
> over because I am certain that he will succeed along with our
> support.

## V.     THE SENTENCING CONSIDERATIONS SET FORTH IN 18 U.S.C. § 3553(a)(2) FURTHER SUPPORT THE REQUESTED SENTENCE OF 120 MONTHS

The sentencing factors in 18 U.S.C. §3553(a)(2) that United States District Court judges
are instructed to consider in arriving at an appropriate sentence include the need for just
punishment, the need for general and individual deterrence, the need for incapacitation, and the

need to provide the defendant with educational and vocational opportunities.  These factors will each be discussed briefly as they apply to Domingo Avilez.

A.    _Just Punishment_

Mr. Avilez has committed a serious offense that he will regret for the rest of his life and for which the law requires ample "just desserts."  However, the requested term of 120 months Federal imprisonment, during which Domingo will seldom if ever have visits from loved ones due to the distance and cost of travel and other barriers, such as securing visas and travel documents, represents very tangible retribution that will adequately promote respect for the Federal narcotics laws.

B.    _Adequate Deterrence_

The need for adequate deterrence includes both specific (individual) and general (societal) deterrence.  Mr. Avilez fully recognizes the grave mistake he made by participating in this drug conspiracy.  The requested 120 months terms of imprisonment is adequate to deter Domingo Avilez from again violating the law.  The approximately 18 months of incarceration he has endured so far have been a huge shock to this young man who has never before been confined.  He fully recognizes the magnitude of the mistake he made and he has manifested his desire to lead a law-abiding life.

From the standpoint of general deterrence, any individual who might have been tempted to participate in a drug conspiracy abroad would think again upon learning they could be facing not only a decade or more of Federal imprisonment, but years of utter and complete separation from their family followed by deportation to a troubled and insecure land.

C.    _Incapacitation/Public Safety_

A 120-month incarceratory term is more than enough to protect the public from any

further misconduct by this defendant, particularly since he will be entering his forties upon

release which is a time when most offenders -- other than complete sociopaths, which Mr. Avilez

is not -- begin to "mature out" of illegal and high risk behavior.  While in custody, Domingo has

focused to the best of his ability on aligning himself with the most positive influences available

among the inmates and has stated his intention of continuing to do the same once he is

designated to a permanent Federal facility.  He has begun studying English in the jail, is spending

time on arts and crafts projects, and is also attending religious-oriented activities and study.  He

will be deported and barred from ever re-entering the United States, but fortunately, he has a

strong family support network to ensure that he does not make similar mistakes again.  There is

no compelling rationale to warehouse or imprison Mr. Avilez beyond the statutory ten years for

purposes of public safety or community protection.

D.      _Educational and Vocational Programs_

        While in prison, Mr. Avilez will under a "best case" scenario have a chance to study

English, complete his high school education and perhaps take additional academic classes.  As a

deportable alien, however, there is a strong likelihood he will not be housed in a Federal BOP

institution but in a privately-operated corrections facility where this type or programming is far

less available.  The maximum benefit from these ameliorative programs can, in any event,

certainly be internalized by Mr. Avilez within a term of 120 months imprisonment.  A longer

period of confinement is not needed from the standpoint of his personal rehabilitation.

E.      _Avoidance of Unwarranted Sentence Disparity_

        18 U.S.C. §3553(a)(6) references "the need to avoid unwarranted sentencing disparities

among defendants with similar records who have been found guilty of similar conduct."  For a

person such as Domingo Avilez, who has never before been to prison either in Mexico or the

United States, a 120-month prison sentence for this offense would in no way represent undue disparity in favor of the defendant. Quite the contrary, it is not uncommon for defendants involved with very large amounts of controlled substances to receive lesser sentences.

In the District of Columbia, defendants responsible for leadership roles in distributing vast quantities of narcotics sometimes receive higher sentences. Typically, however, they are the prime movers or bosses of major organized crime syndicates, or armed militias, who have been extradited from foreign countries. Those defendants who receive the longest sentences are also frequently the ones who adamantly refused to take any responsibility for their crimes and instead put the Government to its burden at trial.

None of the above characteristics apply to Domingo Avilez, who manifested sincere acceptance of responsibility at an early juncture, voluntarily pled guilty, and was, at worst, a mid-level participant in the conspiracy.

## VI.   DEFENDANT AVILEZ CONCURS WITH THE U.S. PROBATION OFFICE'S RECOMMENDED *SMITH* REDUCTION TO ADDRESS THE HARSHER CONDITIONS OF CONFINEMENT FOR DEPORTABLE ALIENS

The Probation Officer has identified a form of potential sentencing disparity which it has recommended the Court remedy by applying a 6-month downward departure. At ¶¶97-99 of the PSR, the USPO makes a compelling case for this sentence reduction pursuant to United States. v. Smith, 27 F.3d 699 (307 U.S. App. DC 1994).

It is well-established that deportable aliens are treated far more harshly than citizens when it comes to custody issues. A United States citizen and a non-United States citizen who have the same background and criminal history, and who commit the same criminal act under the same circumstances, are treated differently when it comes to incarceration. A brief comparison of

sentencing consequences involving a United States citizen vs. a non-United States citizen

follows:

| U.S. Citizen: | Alien: |
| --- | --- |
| Eligible for sentence of home confinement | Not eligible for sentence of home confinement |
| Eligible for community placement in lieu of prison | Not eligible for community placement in lieu of prison |
| Eligible for community placement final part of sentence | Not eligible for community placement last part of sentence |
| Eligible for camp designation | Not eligible for camp designation |
| Eligible for work cadre outside facility | Not eligible for work cadre outside facility |
| Eligible for Residential Drug Abuse Program (RDAP) and 1 year sentence reduction | Not eligible for Residential Drug Abuse Program (RDAP) sentence reduction |
| Placement in lowest eligible security classification nearest to home | Placement in lowest eligible security classification (but not camp) anywhere in the United States |
| Eligible for educational and vocational programs | Not eligible for many educational and vocational programs |
| Release to a half-way house upon completion of sentence | Immigration custody for an additional 30-60 days before being deported |

See, e.g., United States v. Pacheco-Soto, 386 F. Supp. 2d 1198, 1205 (D.N.M. 2005)

("Here, it is solely because of Defendant's status as a deportable alien that he faces an

unwarranted increase in the severity of his sentence.  He likely will not be eligible for any early

release, he will not be able to serve his sentence in a minimum security prison, and he may not

qualify for reduced credits for participation in the residential drug or alcohol abuse program.

These consequences are severe and unfair.")  See also, United States v. Charry Cubillos, 91 F.3d

1342, 1344 (9th Cir. 1996).

The USPO's recommendation for a 6-month departure is wholly merited in this instance.

## VII.   THE REQUESTED BELOW-GUIDELINE SENTENCE OF 120 MONTHS IS IN CONFORMANCE WITH THE CURRENT STATE OF THE LAW

Under the principles set forth in United States v. Booker, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are purely advisory.[1]  The guidelines are now just one among a number of factors that the sentencing courts are meant to assess in imposing a sentencing that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).

Neither §3553(a) itself nor Booker suggests that any of these circumstances is paramount; however, all of these factors are controlled or overridden by §3553(a)'s mandate to impose a sentence "not greater than necessary" to comply with the purposes of sentencing.

Numerous appellate decisions have clarified the role and approach of the sentencing court post-Booker.  The Ninth Circuit has found that "Booker empowered district courts, not appellate courts.... [and] breathe[d] life into the authority of district court judges to engage in individualized sentencing."  United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).

The Sixth Circuit has stated: "Many times we have emphasized that a district court's mandate is to impose a sentence sufficient, but not greater than necessary to comply with the purpose set forth in § 3553(a)(2)."  United States v. Yopp, 453 F3d 770, 773 (6th Cir. 2006). The Sixth Circuit further has explained the role of the sentencing court as follows: "[A] district

---

[1] Two subsequent United States Supreme Court decisions, Spears v. United States, 555 U.S. (2009), and Nelson v. United States, 555 U.S. (2009), reiterated that the guidelines are now truly advisory and that there is no presumption at the District Court level that a guideline sentence is inherently reasonable.  See also Rita v. United States, 551 U.S. 338 (2007), and United States v. Tomko, No. 05-4997 (3rd Cir. April 17, 2009).

court's job is not to impose a 'reasonable' sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).  Reasonableness is the *appellate* standard of review in judging whether a district court has accomplished its task."  United States v. Foreman, 436 F.3d 638, 644 n.1 (6th Cir. 2006).  Furthermore, the Ninth Circuit has stated, concerning the conclusions of the district court relating to sentencing, that the proper standard is abuse of discretion, and it will not "second guess" the court's conclusions so long as they are reasonable.  United States v. Menyweather, 447 F.3d 625, 633 (9th Cir. 2006).

A sentencing court's authority "to reject...the advice of the guidelines," Kimbrough v. United States, 128 S.Ct. at 577 (Scalia, J., concurring), has particular relevance in a case such as the one at bar.  The 2D1.1(c) drug table can be a blunt instrument ill-suited to the wide range of crimes to which it applies.  Moreover, the guidelines' fetish with abstract arithmetic can fail to take account of the devastating effect "that guideline calculations can visit on human beings if not cabined by common sense."  United States v. Adelson, 441 F.Supp. 2d 506, 512 (S.D.N.Y. 2006).

Finally, the Seventh Circuit has stated that post-*Rita* "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence."  United States. v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

## VIII.   CONCLUSION

Defendant Domingo Avilez is a still maturing, youthful, relatively simple person with a young son and significant responsibilities related to that boy's support and care.  The course of

Domingo's journey was influenced by geographic and cultural factors, along with the random vagaries of whom one meets and bonds with in life.  He was undoubtedly further impacted by the violent death of his father, with whom he was very close.  This event made Domingo fearful that he, too, could be targeted for harm.  Seemingly, it drove him deeper into a world where, it appeared to him at the time, there were allies who would support and protect him.  It further seems that he felt a misguided sense of loyalty and indebtedness to these people, and that once recruited, these emotional factors left him vulnerable and he subjugated his own best interests to their demands.  It has not been lost on Domingo that none of these people have stepped forward to offer assistance to he or his family now that he is in custody.

Domingo Avilez understands there can never be any justification or excuse for committing a serious Federal drug crime.  The gravity of his wrongdoing has been indelibly impressed upon him, and those who have interacted with Domingo have been struck by his radically altered perspective and his repentance.  By any measure, he seems to have learned all of the appropriate lessons from this personal ordeal.

Despite the tragedies, the near-tragedies, the strife and chaos that permeated his youth and his upbringing, Domingo is fortunate to come from a strong and close-knit family or origin. Each of his sisters, and his mother whom Domingo describes as an "angel," have overcome considerable adversity to establish legitimate, socially useful lives and careers.   This family support system will be an important source of encouragement to Domingo.  With their guidance, along with this re-set of his own internal compass, he poses limited risk to reoffend or cause further trouble once repatriated to Mexico.

A sentence of 17 years imprisonment would be vastly excessive for this individual.  It would be far longer than needed to achieve the traditional aims of sentencing and would bring

diminishing returns.  It would be tantamount to "beating a dead horse," producing little in the way of tangible benefit for anyone while yielding perhaps irreversible damage in Domino's life as well as sorrow for his mother, sisters and son.

Domingo Avilez's case brings to mind the wisdom of the United States Supreme Court's holding in Koon v. United States, 518 U.S. 81, 113 (1996) at 2047-48:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometime magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge.  Discretion is reserved within the Sentencing Guidelines, and reflected by the standard of appellate review we adopt.

On the grounds set forth in this memorandum and its attachments, a sentence at the minimum mandatory term of 120 months is respectfully requested.

Dated: February 26, 2016

Respectfully submitted,

Law Offices of Matthew Lombard

By: ____/s/ Matthew Lombard_____
    MATTHEW LOMBARD
    Attorney for Defendant
    DOMINGO AVILEZ URIAS